# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

NATHANIEL P. CARSON,      )
    )
    Petitioner,      )     No. 3:15-cv-01121
    )
v.      )     JUDGE TRAUGER
    )
WARDEN KEVIN GENOVESE,      )
    )
    Respondent      )

## MEMORANDUM OPINION

Following a lengthy stay for the petitioner to attempt to exhaust extraordinary remedies in state court, he filed an Amended Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus. (Doc. No. 24). The respondent filed the relevant state court records, and the petitioner's claims have been fully briefed. (Doc. Nos. 30–32, 40). The court will deny the petition for the reasons explained below.

## I. FACTS AND PROCEDURAL HISTORY

The petitioner is serving an effective life sentence in connection with the 2008 shooting deaths of two people in East Nashville. According to the summary of trial evidence published by the Tennessee Court of Criminal Appeals, the victims were adult siblings Pierre and Marie Colas. (Doc. No. 30-12 at 2). Pierre was an assistant professor living in Nashville, and Marie was in town visiting him in August 2008. (*Id.*)

Dr. Sergio Romero testified at trial that he lived in an attic apartment in Pierre's house. Approximately one week before the murders, when he went downstairs to get some water around 1:30 a.m., he saw two men, whom he had never seen before or since, standing outside the kitchen door and looking into the house. (*Id.*) He called out to the men, but they told him to "shut up" and drove away in a car that was parked across the street. (*Id.*) The night of August 26, 2008, Dr.

1

Romero returned home from a meeting around 9 p.m. Pierre was working in his home office, and Marie showed Romero a pair of boots she had bought that day before Dr. Romero went upstairs. (*Id.*) With a door closed and a noisy fan on, Dr. Romero "couldn't really hear what was going on downstairs," but he heard muffled steps and voices and heard Pierre scream "Marie," followed by the sound of a gunshot and Marie saying "please." (*Id.*) Dr. Romero checked to make sure the door to the attic was closed, then he called 911. After the police arrived and led Romero downstairs, he saw Marie on the floor making a wailing sound, bloodied and naked except for her underwear. (*Id.* at 3).

Responding law enforcement officers testified about the discovery of both victims and the collection of evidence from the scene, including a pair of latex gloves and a spent .380 shell casing found on the floor near Pierre's body. (*Id.* at 3). Pierre had been shot in the head and died almost immediately. (*Id.* at 10–11). Marie had also been shot in the head and died days later in Vanderbilt Hospital. (*Id.* at 11). The gunshot wounds were the causes of death for both victims. (*Id.*) DNA analysis of the gloves revealed mixtures of DNA from Pierre, at least two unknown individuals, and George Cody, who was one of the petitioner's co-defendants. (*Id.* at 1, 4). The petitioner was excluded as a contributor from all the DNA evidence tested. (*Id.* at 4).

Witness Thomas Reed, Jr. testified that Cody and the petitioner picked him and Michael "Shane" Holloway up around 10 p.m. the night of August 26 in a brown car. (*Id.* at 4). They went to Cody's house, where Cody and the petitioner stood on the porch for several minutes. The Tennessee Court of Criminal Appeals summarized the rest of Reed's testimony as follows:

> Reed testified that Cody gave him Pierre's identification and credit cards because "[Cody] thought I looked enough like [Pierre] that I might be able to get away with using them." Cody drove Reed and Holloway to Walmart. Reed and Holloway walked into Walmart, and Cody walked in behind them. Reed bought some clothes for himself and a PlayStation 3. Then the three of them drove to a gas station. Reed said that he tried to use the cards to buy cigarettes and "other stuff" but that the

2

clerk "saw that it wasn't me and would not let me buy any of that stuff." Cody, Reed, and Holloway went back to Cody's house, and Cody and Holloway left to trade the PlayStation for crack cocaine. When Cody and Holloway returned shortly after 3:20 a.m. on August 27, they smoked the cocaine with Reed and Hutcheson. About 5:00 a.m., Cody and Holloway dropped off Reed at the La Quinta Inn. Holloway returned to the hotel about 8:00 a.m. A couple of days later, the police arrested Reed at the hotel. Reed said that he knew the credit cards were stolen but that he did not know anyone had been murdered.

On cross-examination, Reed acknowledged that he was a thief and a drug addict and that he had never previously identified the [petitioner] as the man with Cody on August 26. He also acknowledged that he was "high" when he got into the brown car and that he had been using Fentanyl, a prescription drug, all day. He acknowledged that the [petitioner] did not participate in the credit card scheme. Reed denied that he and Holloway bragged about "jack[ing] and robb[ing] somebody" to get the credit cards.

(*Id.* at 5.)

Police Officer Ben Ward testified that surveillance video of individuals using and attempting to use Pierre's credit card in the early morning hours following the murder led to the identification and arrest of those individuals, and that Reed's description of a man in Cody's car led to development of the petitioner as a suspect. (*Id.* at 5). The petitioner voluntarily went to the police department on September 2, 2008, where Ward read him his *Miranda* rights[1] and interviewed him. (*Id.* at 5–6). The videotape of the interview was played for the jury, and the Tennessee Court of Criminal Appeals summarized that evidence:

During the interview, the [petitioner] said that about 5:00 a.m. on August 27, 2008, Cody came to the [petitioner]'s girlfriend's house, tapped on the window, and tried to get the [petitioner] to go to Walmart to use some credit cards. Cody did not tell the [petitioner] who owned the credit cards, and the [petitioner] did not ask Cody. Two white males were in Cody's car, and one of them was sitting in the front passenger seat. Cody stayed at the [petitioner]'s house for about ten minutes. The [petitioner] refused to help Cody, so Cody and the two white males left. The [petitioner] said that, prior to that incident, he had not seen or talked with Cody for about one week. The [petitioner] claimed that after he helped his girlfriend with her paper route on August 29, 2008, he walked to a gas station to get a drink. He saw police cars and walked to Cody's house to see what was happening. During the

---

[1] The Supreme Court announced in *Miranda v. Arizona*, 384 U.S. 436 (1966), that a defendant must be warned of his right to counsel and to remain silent before a custodial interrogation and that statements elicited in the absence of such warning or in violation of such rights are inadmissible in court.

3

interview, Officer Ward told the [petitioner] that he had video evidence of the [petitioner] in Cody's car. The [petitioner] said, "You are a liar." The [petitioner] accused the officer of trying to trick him and stopped the interview.

(*Id.* at 6).

Officer Kenneth Bray testified that at around 3:30 a.m. on August 29, he found a car that matched the description of the suspects' car in the driveway of a house. (*Id.* at 6). While Bray was stopped by the car filling out paperwork, Cody came out of the house, and Bray noticed that Cody looked like the individual in a photograph of one of the suspects. After providing identification, Cody went back into the house. Bray and another officer approached the house to detain Cody, and Cody's girlfriend opened the door. Inside, Bray saw Michael Holloway, who matched the description of another suspect. The car turned out to be owned by the girlfriend's father. (*Id.*)

Police Sergeant Mickey Yentes testified that as he was sitting in his patrol car outside Cody's house following Cody's arrest in the early morning of August 29, the petitioner approached the scene, "constantly looking around, trying to inch closer to the . . . scene, obviously, interested in what was going on." (*Id.* at 7). Yentes asked him what he was doing there, and the petitioner said he was "just curious and wanted to know what was going on." (*Id.*) Yentes later participated in the search of Cody's house, where authorities found the victims' identification, social security cards, and credit cards, a revolver, and a .380 pistol that was inside a sock, inside a shoe on the back porch. (*Id.*) It was stipulated at trial that the shell casing found in the floor at the murder scene and the bullets removed from the victims' bodies were fired from that pistol. (*Id.* at 11). A partial genetic profile found on the pistol was consistent with Cody's DNA and would have been found in one of every 2,600 people in the African-American population. (*Id.* at 4).

The lead detective on the case, Matthew Filter, testified that the petitioner lived less than a block from Cody's house and within approximately one mile of Pierre's house. (*Id.* at 11). During Filter's testimony, the state introduced into evidence telephone records that established several

4

phone calls between the petitioner's phone and Cody's phone and between the petitioner's phone and co-defendant Churchwell's phone surrounding the murders. (*Id.* at 7–8). Specifically:

> On the day before the shootings, August 25, 2008, Cody and the [petitioner] made several telephone calls to each other. On August 26, 2008, Cody telephoned the [petitioner] at 8:34 a.m. and 5:04 p.m. The [petitioner] telephoned Cody at 9:56 a.m., 11:26 a.m., 11:44 a.m., 12:22 p.m., 12:43 p.m., 1:12 p.m., 2:26 p.m., and 8:29 p.m. The shootings occurred about 9:10 or 9:15 p.m. The [petitioner] telephoned Cody at 9:39 p.m., 10:48 p.m., and 11:05 p.m., and Cody telephoned the [petitioner] twice at 11:10 p.m. On August 27, 2008, Cody telephoned the [petitioner] at 2:40 p.m., 3:49 p.m., 7:49 p.m., 9:11 p.m., and 9:57 p.m. The [petitioner] telephoned Cody at 6:32 a.m., 1:08 p.m., 3:50 p.m., 6:37 p.m. [FN4: Detective Filter testified that Cody telephoned the appellant at 6:37 p.m. However, our review of the records shows that the appellant telephoned Cody at 6:37 p.m.], and 9:57 p.m. [FN5: Although not mentioned by Detective Filter, our review of the telephone records shows that the appellant also telephoned Cody at 12:06 p.m.] On August 28, 2008, Cody telephoned the [petitioner] at 6:39 p.m. and 10:50 p.m. The [petitioner] telephoned Cody at 3:49 p.m., 6:35 p.m., 10:22 p.m., 10:26 p.m., 10:43 p.m., and 10:51 p.m. On August 29, 2008, the day Cody was arrested, the [petitioner] telephoned Cody at 3:06 a.m., 3:23 a.m., 3:54 a.m., 4:05 a.m., and 4:15 a.m.

> Detective Filter also testified about telephone calls made between Churchwell and the [petitioner]. On August 25, 2008, the [petitioner] telephoned Churchwell at 1:41, p.m. 1:45 p.m., 3:53 p.m. 3:55 p.m., 5:29 p.m., 8:20 p.m., and 10:06 p.m. On August 26, the [petitioner] telephoned Churchwell at 8:11 p.m., which was about one hour before the shootings, and at 10:12 p.m. On August 27, 2008, the [petitioner] telephoned Churchwell at 2:06 p.m., 3:09 p.m., 3:42 p.m., 3:43 p.m., 6:44 p.m., 6:52 p.m., and 9:12 p.m. Churchwell telephoned the [petitioner] at 3:46 p.m., 6:32 p.m., and 11:26 p.m. On August 28, 2008, the [petitioner] telephoned Churchwell at 3:47 p.m., 6:42 p.m., and 6:43 p.m. Churchwell telephoned the [petitioner] at 6:43 p.m. On August 29, 2008, the [petitioner] telephoned Churchwell at 12:03 p.m., 12:22 p.m., 12:34 p.m., and 6:20 p.m. Churchwell telephoned the [petitioner] at 12:20 p.m., 12:21 p.m., and 12:23 p.m. On August 30, 2008, the [petitioner] telephoned Churchwell at 2:33 p.m., 3:33 p.m., and 7:06 p.m. On August 31, 2008, the [petitioner] telephoned Churchwell at 3:03 p.m.

> Detective Filter testified that on the day of the shootings, the [petitioner] telephoned Cody about forty-five minutes before the shootings and about twenty-five minutes after the shootings. He said a person "very easily" could have walked from Pierre's house on McFerrin Avenue to the [petitioner]'s house on Carter Street within twenty-five minutes. The [petitioner]'s cellular telephone records for August 26, 2008, also showed that the [petitioner] telephoned the La Quinta Inn, where Reed and Holloway were staying, at 11:07 p.m., about two hours after the shootings. About 3:30 a.m. on August 29, 2008, while police officers were looking for the suspects, the [petitioner] telephoned Cody. About 4:15 a.m., police officers detained Cody at his home. Detective Filter said the [petitioner] would have been able to see police cars at Cody's home from the [petitioner]'s home. The police

arrested the [petitioner] in February 2009.

(*Id.* at 8–9).

Two jail inmates testified to the effect that, while they were all in jail together, the petitioner expressed concern that another inmate, Maurice Boyd, was "snitching" in connection with the Colas case. (*Id.* at 9–10). One of the inmate witnesses heard the petitioner and another inmate, Lobbins, discuss Boyd several times and that the petitioner conspired with Lobbins to stab Boyd. (*Id.* at 9). Lobbins did ultimately stab Boyd while one inmate witness held Boyd and the other inmate witness observed the petitioner standing at the door to his own cell. (*Id.* at 9–10). After the stabbing, the petitioner told the inmate who had held Boyd that the petitioner would put some money in the witness's commissary account, but the petitioner never did so. (*Id.*) Both witnesses acknowledged having criminal histories and pending charges, including a charge of conspiracy to commit first degree murder against the inmate who participated in the attack on Boyd, but they denied having any agreements with the state for leniency in exchange for their testimony. (*Id.*)

The petitioner's former girlfriend, Margaret McGatha, testified that he was living with her in August 2008 and that he was in the backyard when she went to bed between 9 and 10 on the night of August 26, was watching television in the living room when she woke at midnight, and accompanied her when she started her paper route after getting up around 3 or 3:30 a.m. the next day. (*Id.* at 11). She said he did not have any credit cards in his possession. She also testified that she saw the police at Cody's house while she was delivering papers the morning of August 29, and that she and the petitioner went to Cody's house to see what was going on after she finished her route. (*Id.*) The Tennessee Court of Criminal Appeals summarized McGatha's cross-examination as follows:

> On cross-examination, McGatha acknowledged that she gave a statement to police on January 23, 2009, and that her memory then would have been better than it was at trial. She acknowledged that when the police asked her about August 26, 2008,

she told them, "I don't know about that exact day. I couldn't tell you." She said that if the [petitioner] left her home between 10:00 p.m. and midnight on August 26, 2008, she would not have known. She acknowledged that she told the police, "[W]ell, he told me he didn't do it." She also acknowledged that when the police asked her if the [petitioner] was present during the shootings, she said, "[H]e didn't say all that. He just said he didn't do it." The State showed McGatha the [petitioner]'s cellular telephone records for August 26, 2008, and she acknowledged that they showed she called the [petitioner]'s cellular telephone at 9:49 p.m. McGatha said that the [petitioner] may have lost his telephone and may have used her telephone to call and find his telephone. She also said her children may have used her telephone to call the [petitioner] because he was in the back yard.

(*Id.* at 11–12).

At the conclusion of the 2010 trial, a Davidson County jury convicted the petitioner of two counts of first-degree felony murder and two counts of especially aggravated robbery. (Doc. No. 30-1 at 1, 90, 92–95). The trial court sentenced him to life in prison for each count of murder and fifteen years for each count of robbery but ordered all sentences to run concurrently for an effective sentence of life in prison. (*Id.* at 92–95).

The Tennessee Court of Criminal Appeals affirmed the judgments on direct appeal, and the Tennessee Supreme Court denied discretionary review. (Doc. Nos. 30-12, 30-16). The petitioner sought post-conviction relief in the trial court, which was denied after appointment of counsel and an evidentiary hearing. (Doc. Nos. 30-18, 30-19). The Tennessee Court of Criminal Appeals affirmed the denial of relief, and the Tennessee Supreme Court again denied discretionary review on February 12, 2015. (Doc. Nos. 30-23, 30-27).

The petitioner submitted his federal habeas petition for mailing on July 23, 2015, along with a simultaneous motion to stay the federal action while he pursued a Writ of Error Coram Nobis in state court. (Doc. No. 1 at 14; Doc. No. 3). Those documents were originally filed in the United States District Court for the Western District of Tennessee, which transferred the case to this court in keeping with the common practice among the federal courts in this state to hear

Section 2254 petitions in the district of conviction. (Doc. No. 7).  This court granted the motion to stay on November 4, 2015. (Doc. No. 10).

Meanwhile, the petitioner filed his coram nobis petition in state court in September 2015. (Doc. No. 30-29 at 46).  The trial court dismissed the petition, and the Tennessee Court of Criminal Appeals affirmed the dismissal. (Doc. No. 30-35).  The Tennessee Supreme Court denied discretionary review yet again on March 26, 2020. (Doc. No. 30-39).

This case was reopened on the petitioner's motion, and his Amended Petition filed thereafter is the operative petition. (Doc. Nos. 19, 23, 24).

## II.     ISSUES PRESENTED FOR REVIEW

The petition raises the following claims for relief:

1.  The indictments were void and/or defective. (Doc. No. 24 at 6).

2.  Counsel was ineffective in various ways. (*Id.* at 8). And

3.  The petitioner has newly discovered exculpatory evidence. (*Id.* at 10).

## III.     STANDARD OF REVIEW

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal

sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (d)(2). A state court's legal decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A state court

decision is not unreasonable under this standard simply because the federal court finds it erroneous or incorrect. *Id.* at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination; the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting § 2254(d)(2) and (e)(1)); *but see McMullan v. Booker*, 761 F.3d 662, 670 & n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read *Matthews* to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under Section 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

Thus the standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Richter*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). Petitioner carries the burden of proof. *Pinholster*,

563 U.S. at 181.

Even that demanding review, however, is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system. 28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Pinholster*, 563 U.S. at 182. This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (explaining that exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment."); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when

an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. *Id*. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him [;] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." *Id.* To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of

one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006).

## IV.    ANALYSIS

### A.    Defective Indictments

The petitioner alleges that the "theory of 'criminal responsibility'" charged in the indictments was so vague that it "enabled the trial court to give erroneous and/or inaccurate jury instructions . . . that were inconsistent with Tennessee Pattern Jury Instructions." (Doc. No. 24 at 6).

The respondent asserts that this claim is procedurally defaulted, having not been raised in any of the petitioner's appeals. (Doc. No. 32 at 17).  The petitioner replies that the claim is not defaulted because it "has been presented for state review, although imperfectly, on multiple occasions." (Doc. No. 40 at 41).  To support that position, he cites several portions of the record without discussion.[2] (*Id.*)  Review of the cited documents reveals that the petitioner's original pro se state petition for post-conviction relief asserted that "the charging instruments in this case are void on their face because they allege a legal conclusion" and that the indictments were therefore void and deprived the trial court of jurisdiction to convict him. (Doc. No. 30-18 at 55–60).  The petitioner went on to present that claim as a violation of the Sixth and Fourteenth Amendments to the United States Constitution. (*Id.* at 56.)  The amended post-conviction petition filed by counsel

---

[2]    Several of the cited documents are irrelevant to any claim about defective indictments. The first is a page of the petitioner's motion for a new trial in which he asserted insufficient evidence to support his convictions. (Doc. No. 30-1 at 97).  The second is an order by the Tennessee Supreme Court denying what it deemed to be an improperly filed motion for review filed by the petitioner, proceeding pro se, almost seven years after the conclusion of his direct appeal. (Doc. No. 30-17).  Third, the petitioner cites a portion of the ruling by the Tennessee Court of Criminal Appeals in his direct appeal, in which that court rejected his claim that the evidence was insufficient to support his convictions. (Doc. No. 30-18 at 36).

preserved that claim "as set out in the Petition" and added a claim of ineffective assistance of counsel. (Doc. No. 30-18 at 135–36). The trial court denied relief on the insufficient-indictment claim, finding that "[t]he indictments sufficiently allege the requisite statutory elements of each offense" and that "there [was] obviously no constitutional violation with regard to the indictments." (*Id.* at 144).

In the petitioner's appeal from that decision, however, his only claim in connection with the indictments was about counsel's alleged ineffectiveness:

> The Appellant would next show that his trial attorney's performance was deficient because he failed to demand a bill of particulars to give the Appellant adequate notice of what he was being charged with. The Appellant testified that at the time he had no idea what felony murder was, and that he believed the indictment was too vague because it only accused him of murder and aggravated robbery. . . .
>
> Informing a client in detail of the nature of charges is one of the most fundamental duties of an attorney, and this failure denied the Appellant of the right to know exactly what the State was attempting to prove at trial, and as such prejudiced the Appellant's case in a material way.

(Doc. No. 30-21 at 18–19). The state's appellate brief indicates that it understood the petitioner's appeal to assert only that his counsel was ineffective. (Doc. No. 30-22 at 3, 6.) The Tennessee Court of Criminal Appeals, likewise, understood the issue on appeal to be whether "the post-conviction court's ruling that he did not receive ineffective assistance of counsel [was] erroneous." (Doc. No. 30-23 at 4).

Although the two claims are obviously related, the petitioner's exhaustion of his ineffective-assistance claim "does not similarly exhaust the underlying substantive claim" about the indictment. *Wogenstahl v. Mitchell*, 668 F.3d 307, 343 (6th Cir. 2012). The Sixth Circuit has explained that "bringing an ineffective assistance claim in state court based on counsel's failure to raise an underlying claim does not preserve the underlying claim for federal habeas review because the two claims are analytically distinct." *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008)

(internal quotation marks omitted).

The petitioner can no longer present his faulty indictment claim to the Tennessee appellate courts because the 30-day window for filing a direct appeal expired long ago and he is barred by Tennessee's "one-petition" limitation on post-conviction relief.[3] *See* Tenn. R. App. P. 4(a); Tenn. Code Ann. § 40-30-102(a). Because the petitioner did not properly exhaust his indictment claim in state court and can no longer do so, the claim is technically exhausted, but procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991)

The petitioner does not offer any cause to excuse the default of this claim, and none is apparent from the record. Accordingly, this claim is defaulted and precluded from federal habeas review.

**B.    Ineffective Assistance of Counsel**

The petitioner alleges that trial counsel was ineffective for: (1) failing to demand a bill of particulars; (2) failing to thoroughly investigate the state's file in pre-trial discovery; (3) failing to offer Timothy Baker as a witness to rebut the state's "Rule 404(b) evidence" at a hearing; (4) presenting an irrelevant alibi theory when the petitioner's presence was not in question; (5) failing to present Mr. Thomas as a witness in support of the alibi defense; and (6) failing to learn the location of a witness, resulting in a delay in the trial for the witness to travel from Alabama to testify.[4] (Doc. No. 24 at 8).

---

[3]    There are three narrow circumstances in which a state prisoner may file a motion to reopen post-conviction proceedings, but none apply to Petitioner's claims. See Hodges v. Colson, 727 F.3d 517, 530 (6th Cir. 2013) (citing Fletcher v. Tennessee, 951 S.W.2d 378, 380–81 (Tenn. 1997) ("A [Tennessee] prisoner may file a motion to reopen his first post-conviction petition only if his claim stems from a newly established constitutional right that applies retroactively, relies on scientific evidence that he is actually innocent, or involves a sentence enhanced because of a previous conviction that has been declared invalid.").

[4]    The court observes that the Amended Petition references ineffective assistance of "trial/appellate counsel," but every instance of ineffective assistance alleged took place before or during trial. (*See* Doc. No. 24 at 8).

The respondent asserts that only ineffective-assistance claims 1 and 5 were properly exhausted in state court. The Tennessee Court of Criminal Appeals considered and rejected those claims on post-conviction appeal:

> The Petitioner contends that the post-conviction court's ruling that he did not receive ineffective assistance of counsel is erroneous. The Petitioner argues that trial counsel's representation was ineffective because he failed to call a second alibi witness and also because he failed to demand a bill of particulars. The State responds that trial counsel's decision not to call the second alibi witness was a reasonable tactical decision and that Mr. Thomas's testimony would not have assisted the Petitioner at trial. The State further responds that the Petitioner has failed to support his claim that trial counsel should have filed a motion for a bill of particulars with relevant law. Additionally, the State responds that the Petitioner has failed to prove any deficiency or prejudice resulting from the failure to request a bill of particulars. We agree with the State.
>
> In a post-conviction proceeding, the burden is on the Petitioner to prove his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40–30–110(f); *see Dellinger v. State*, 279 S.W.3d 282, 293–94 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. *Id.* Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id.* at 457.
>
> Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockart v. Fretwell*, 506 U.S. 364, 368–72 (1993). In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n. 2 (Tenn. 1989).
>
> A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the *Strickland* test. *See Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. In *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general

16

standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

The Petitioner first asserts that trial counsel should have called his brother, Orian Thomas, to testify as an abili witness. "When a petitioner presents at the post-conviction hearing a witness he claims should have been called at trial, the post-conviction court must determine whether the testimony would have been (1) admissible at trial and (2) material to the defense." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008). The post-conviction court may find that trial counsel's performance was not deficient by concluding either that the proffered testimony would not have been admissible at trial or that "it would not have materially aided the petitioner's defense at trial." *Id.* (emphasis added).

Trial counsel testified at the post-conviction hearing that although he could not remember exactly why he chose not to call Mr. Thomas, it was probably because he already had an alibi witness, Ms. McGatha. The Petitioner testified that trial counsel did not want to call Mr. Thomas as a witness because he was "kind of loopy." Also, as noted by the post-conviction court, neither Ms. McGatha nor Orian Thomas were physically in the presence of the Petitioner at the time of the shootings. Ms. McGatha testified at trial that the Petitioner was in her backyard during the time in question, while Mr. Thomas testified that the Petitioner was in the house when Mr. Thomas heard gunshots and that the Petitioner did not come out into the backyard until shortly thereafter. Furthermore, at the post-conviction hearing, Mr. Thomas contradicted the Petitioner's own testimony that he was not in possession of his cell phone at the time of the shootings. The Petitioner has failed to show that Mr. Thomas's testimony would have materially aided his defense or that trial counsel's decision not to call Mr. Thomas as a witness was unreasonable.

The Petitioner next contends that trial counsel was ineffective for failing to request a bill of particulars. Initially, we note that the Petitioner has failed to support this argument with citation to any authority, as required by Tennessee Rule of Appellate Procedure 27(a)(7)(A). Nevertheless, we will address the Petitioner's argument on the merits. Tennessee Rule of Criminal Procedure 7(c) states that "[o]n defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged." One of the purposes of a bill of particulars is to provide "a defendant with information about the details of the charge against him if this is necessary to the preparation of his defense." *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991) (emphasis added) (quoting *State v. Hicks*, 666 S.W.2d 54, 56 (Tenn. 1984)). Furthermore, "[a]n indictment that charges an accused on the principal offense 'carries with it all the nuances of the offense,' including criminal responsibility." *State v. Lemacks*, 996 S.W.2d 166, 173 (Tenn. 1999) (quoting *State v. Lequire*, 634 S.W.2d 608, 615 (Tenn. Crim. App. 1981)).

At the post-conviction hearing, trial counsel testified that he felt no reason to file a motion for a bill of particulars because he had access to the State's discovery and

did not know of any additional information that "needed filling in." He further testified that he would "[a]bsolutely" have explained a theory of criminal responsibility to a defendant charged in a multi-count indictment with co-defendants. Although the Petitioner claimed that trial counsel told him there was "no way" he would be convicted, trial counsel testified that he tried to persuade the Petitioner to accept the State's plea offer because of the "substantial" evidence against him. We agree with the post-conviction court that the Petitioner was apprised of the information he needed to make an informed decision about whether to accept or reject the plea agreement, and thus was not prejudiced by trial counsel's failure to request a bill of particulars.

(Doc. No. 30-23 at 4–7).

The state court correctly identified and summarized the *Strickland* standard applicable to federal claims of ineffective assistance of counsel and rejected these claims on their merits. The question before this court is thus whether the state court's ruling was objectively unreasonable as required to warrant relief under AEDPA. As the Supreme Court clarified in *Harrington v. Richter*, 562 U.S. 86 (2011),

This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* at 101 (internal quotation marks and citation omitted). Accordingly, this court need not decide whether the state court's application of *Strickland* was correct, but only whether it was reasonable. *Id.* ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable."). The petitioner acknowledges that the standard to be applied here is "doubly deferential." (Doc. No. 40 at 42).

The state courts credited counsel's testimony at the post-conviction hearing and effectively found that his choices in question were the result of considered strategy. "Because advocacy is an

18

art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." *Strickland*, 466 U.S. at 681. In assessing counsel's performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id*. at 690-91.

The petitioner argues that the state court "considerably misconstrued" the facts regarding Thomas's proposed testimony compared to McGatha's in reaching its decision. (Doc. No. 40 at 43). But regardless of whether McGatha's testimony left room for the petitioner to have been in the house when the shots were fired, as Thomas testified, Thomas's proposed testimony did not include his actually being with the petitioner when the shots were fired. Rather, Thomas testified at the post-conviction hearing that Thomas heard the two gunshots when he was in the backyard at the home where the petitioner was staying, but that the petitioner was not in the yard with him at that time and denied having heard the gunshots when he returned to the yard later. (Doc. No. 30-19 at 31–32). Thomas would also have confirmed that the petitioner had his cell phone in his possession that night when the damaging phone calls to and from his phone were made. (*Id.* at 34–35). On that record, the state court reasonably concluded that Thomas's testimony would not have materially aided his defense and that counsel's decision not to call him was not deficient.

The state courts also reasonably deferred to counsel's decision that a bill of particulars was not necessary. Counsel, who had been practicing criminal law for almost twenty years, testified that he was aware the petitioner had been charged in a multi-count indictment with co-defendants, that he "[a]bsolutely" would have discussed with the petitioner the theory of his liability based on criminal responsibility, and that he was "sure [he] would have" done so even though it was not spelled out in the indictment. (*Id*. at 17, 21–22). The petitioner was not the first of the co-

defendants to go to trial, and counsel had monitored the other cases and knew of the co-defendants' convictions. (*Id.* at 22). Counsel had expressed to the petitioner that a conviction in his case was likely and tried to persuade him to accept a plea deal, but the petitioner refused. (*Id.* at 17, 23). Counsel also believed he "had all of the information that the State had" via discovery. (*Id.* at 24). He thus had no need to seek a bill of particulars, because he did not need any additional information. (*Id.*) The state court's conclusion that the petitioner had been advised of the elements of the case against him and that he was not prejudiced by the absence of a bill of particulars was reasonable on that record. The petitioner is thus not entitled to relief on either of his exhausted ineffective-assistance claims.

The respondent asserts that the remaining ineffective-assistance claims in the Amended Petition are presented for the first time in this court and are thus procedurally defaulted. (Doc. No. 32 at 22). Inexplicably, the respondent does not acknowledge that the default of claims of ineffective assistance of trial counsel can be excused pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). Specifically, the ineffectiveness of post-conviction counsel can establish cause "to consider the merits of a claim that otherwise would have been procedurally defaulted." *Id.* at 17. To determine whether a petitioner has effectively demonstrated cause under *Martinez*, the court considers "(1) whether state post-conviction counsel was ineffective; and (2) whether [the petitioner's] claims of ineffective assistance of counsel were 'substantial.'" *Atkins*, 792 F.3d at 660 (citations omitted). For the purposes of *Martinez*, "[a] substantial claim is one that has some merit and is debatable among jurists of reason." *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 713 (6th Cir. 2015) (citing *Martinez*, 566 U.S. at 14). On the other hand, a claim is not substantial "when 'it does not have any merit,'" or when it "'is wholly without factual support.'" *Porter v. Genovese*, 676 F. App'x 428, 432 (6th Cir. 2017) (quoting *Martinez*, 566 U.S. at 15–16). If the petitioner

demonstrates cause, then the court must consider "whether [he] can demonstrate prejudice." *Id.* And if the petitioner establishes both "cause" and "prejudice," only then would the court "evaluate [his] claims on the merits." *Id.* (citations omitted).

In many cases, the respondent's failure to address such an obvious issue with his procedural defense would require additional briefing, if not a hearing, for the court to resolve the issue. Resting on a three-sentence defense to these claims without addressing whether they are substantial or otherwise might warrant further consideration under *Martinez* is, therefore, a risky strategy for the respondent. In this case, however, the court finds that it can rule on these claims without benefit of further development.

The petitioner's first defaulted ineffective-assistance claim is that counsel "neglected to thoroughly investigate the State's 'open file' discovery prior to trial." (Doc. No. 24 at 8). This claim was not specifically addressed during the post-conviction hearing in state court, but relevant evidence was nevertheless elicited there. Specifically, counsel testified that he believed he had all the information the state had because "the State very possibly gave me open file Discovery." (Doc. No. 30-19 at 24). Accordingly, what evidence exists on this claim refutes the unsupported allegation that counsel failed to review the prosecution's file. Moreover, the petitioner does not identify any evidence in the file that might have changed the outcome of his trial had counsel discovered it. Accordingly, this claim is not sufficiently substantial to warrant further consideration under *Martinez* because it lacks any factual support, and because the petitioner fails to allege any prejudice arising from counsel's performance.

Next, the petitioner complains that counsel "failed to provide any of the known pre-trial witnesses, specifically inmate Timothy S. Baker, to rebut the State's introduction of its Rule 404(b) evidence at hearing." (Doc. No. 24 at 8). This claim is insubstantial for several reasons. The court

assumes that the petitioner is referencing evidence admitted at trial pursuant to Tennessee Rule of Evidence 404(b), which permits the entry of evidence of prior "crimes, wrongs, or acts" under certain circumstances for some purpose other than to show the defendant's conformity with a character trait. Tenn. R. Evid. 404(b). But the petitioner does not cite or otherwise identify the character evidence in question or say how testimony by Timothy Baker or anyone else would have effectively rebutted it. Later in the Amended Petition, the petitioner mentions that the prosecution was permitted to use the petitioner's alleged involvement in the conspiracy and attempt to murder his fellow inmate (included in the summary of facts above) as evidence at trial under Rule 404(b). The court's own review of the record reveals that the state originally intended to offer testimony from Gregory Chafos, one of the inmate witnesses to that conspiracy, to the effect that one of the conspirators had gone directly from the stabbing to give the petitioner some item that the petitioner then flushed down the toilet. (Doc. No. 30-29 at 69.) During argument about the admissibility of the jailhouse conspiracy evidence, counsel said the defense could rebut the testimony about someone's delivering that item to the petitioner but acknowledged that he had not subpoenaed a witness to do so. (*Id.* at 78.) Even assuming that is the failure about which the petitioner now complains, he does not explain who Timothy Baker is, what his testimony would have been, or how it would have changed the outcome of his trial.[5] Moreover, Chafos ultimately did not testify at trial about the delivery of any item to the petitioner after the stabbing, so that failure by counsel seems wholly immaterial. (Doc. No. 30-6 at 32–56.)

Rule 2 of the Rules Governing Section 2254 Cases ("Habeas Rules") requires petitioners to "state the facts supporting each ground" for relief. Habeas Rule 2(c)(2). This rule is "more

---

[5] The court observes that another inmate, Lawrence Baker, was one of the inmates whose trial testimony implicated the petitioner in the plan to murder Maurice Boyd for cooperating with the government in the petitioner's case. (Doc. No. 30-6 at 8–20).

demanding" than Rule 8(a) of the Federal Rules of Civil Procedure, under which "a complaint need only provide 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Mayle v. Fenix*, 545 U.S. 644, 655 (2005) (citations omitted) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also Lynn v. Donahue*, No. 1:14-cv-01284, 2017 WL 5930304, at *7 n.1 (W.D. Tenn. Nov. 30, 2017) (citations omitted) (noting that habeas claims are "subject to dismissal" if "they are pled only as general allegations which fail to identify the specific error and the resulting prejudice"). The petitioner's less-than-bare-bones presentation of this claim does not comply with this Rule and does not provide the court with sufficient information to evaluate his claim, even with the court's guesswork set forth above. Accordingly, this claim is subject to dismissal regardless of its defaulted status, and it is definitely not "substantial" for *Martinez* purposes.

The petitioner next asserts that the alibi defense counsel presented was "obviously irrelevant . . . because the petitioner's presence was never in question." (Doc. No. 24 at 8). But during argument on his motion for acquittal, counsel relied on the state's failure to prove the petitioner's presence during the murders as part of his overall argument that the state had failed to prove the petitioner was involved in the murders at all. (Doc. No. 24-13 at 1). That argument was unsuccessful, but that does not make it ineffective. The possibility of conviction on a criminal responsibility theory meant that proving the petitioner was somewhere else when the murders happened could not guarantee an acquittal. But common sense dictates that it was still important to try to convince the jury that the petitioner was not directly involved in robbing and murdering the victims.

Moreover, the petitioner does not suggest any defense that would have been better than an alibi defense. The petitioner chose not to testify in his own defense. (Doc. No. 30-6 at 90–91). He also refused a plea agreement despite counsel's advice to accept it. (Doc. No. 30-19 at 17, 23–24).

The petitioner does not argue that the outcome of his trial would have been better with no defense at all or identify a different defense theory that might have led to acquittal. In the absence of any suggestion of prejudice arising from the counsel's allegedly deficient theory, this claim is not sufficiently substantial to merit additional consideration under *Martinez*.

And finally, the petitioner claims that counsel "was completely unaware of" witness McGatha's whereabouts before and during trial, resulting in the trial's being "momentarily delayed" so the witness could be located and appear to testify. (Doc. No. 24 at 8). During the post-conviction hearing, counsel had no memory of having lost track of McGatha's location before she testified. (Doc. No. 30-19 at 20). The state court record establishes that the jury left the courtroom at 9:37 a.m. for the court to take up "some legal matters" after the close of the state's case. (Doc. No. 30-6 at 80). In response to the trial judge's inquiry, the petitioner's counsel announced that his witness was on Murfreesboro Road and would be at court in twenty or twenty-five minutes. (*Id.*). The court then heard argument on counsel's motion for acquittal and held a colloquy to determine that the petitioner was waiving his right to testify before recessing. (*Id.* at 80–92). The jury returned to the courtroom at 10:04 a.m., and counsel immediately called McGatha to the stand. (*Id.* at 92). Whatever delay was occasioned by the need for McGatha to arrive at the courthouse was thus, quite literally, momentary. The petitioner cannot demonstrate any reasonable likelihood that more careful monitoring of McGatha's movements before her testimony would have benefitted his defense. Accordingly, this claim is not sufficiently substantial to merit further consideration under *Martinez*.

So, to summarize, two of the petitioner's ineffective-assistance claims (1 and 5) were properly exhausted in state court and do not merit relief under AEDPA because the state courts reasonably denied them on their merits. His other four ineffective-assistance claims (2–4 and 6)

are raised here for the first time and are not substantial claims for the purpose of warranting further review under *Martinez*. Accordingly, the petitioner is not entitled to relief on the basis of ineffective assistance of counsel.

## C. Exculpatory Evidence

The petitioner's final claim hinges on the alleged conspiracy to murder a fellow inmate, about which evidence was admitted at his trial as summarized above. The petitioner asserts that he later discovered "several previously undisclosed jail 'incident reports' . . . detailing the actual events and/or perpetrators" in the jailhouse conspiracy, which warrant habeas relief. (Doc. No. 24 at 11).

In September 2015, the petitioner filed a petition for writ of error coram nobis in the state trial court alleging that these documents constituted suppressed exculpatory material and entitled him to relief. (Doc. No. 30-29 at 46–50). In a memorandum in support of the petition filed by appointed counsel, the petitioner asserted (1) that the "reports from November of 2009 existed at the time of the original trial, but were unknown to and undiscoverable by an exercise of diligence by the Petitioner or the Petitioner's attorney at trial" and (2) that the reports "would have undermined the State's position that the Petitioner was involved in the attempted assassination of a jail house informant, and could have quite possibly resulted in a different verdict from the jury as the 'hit' on the jail house informant was a lynchpin [sic] of the State's case against the Petitioner." (Doc. No. 30-30 at 70–71). The trial court denied relief on the basis that the petition was barred by the statute of limitations applicable to coram nobis petitions. (*Id.* at 74–77). The Tennessee Court of Criminal Appeals affirmed that ruling:

> The Petitioner acknowledges that he did not file his petition for writ of error coram nobis within the statute of limitations; however, he maintains that he is entitled to relief because there was newly discovered evidence. He asserts that the statute of limitations should be tolled. The State responds that the Petitioner's claim was

barred by the statute of limitations. Further, the State asserts that the Petitioner's *Brady* claim[6] is not a cognizable coram nobis claim. We agree with the State.

The petition for writ of error coram nobis is an "extraordinary procedural remedy" that "fills only a slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999). A writ of error coram nobis lies "for subsequently or newly discovered evidence relating to matters which were not litigated at trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at trial." T.C.A. § 40-26-105(b). To obtain coram nobis relief, the petitioner must prove "(1) that he or she was reasonably diligent in seeking the evidence; (2) that the evidence is material; and (3) that the evidence is likely to change the result of the trial." *State v. Hall*, 461 S.W.3d 469, 495 (Tenn. 2015). "Newly discovered evidence that is merely cumulative or serves no other purpose than to contradict or impeach does not warrant coram nobis relief." *Id.* (internal quotations omitted). The coram nobis court should consider both the evidence at trial and the evidence presented at the coram nobis proceeding in determining "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." *State v. Vasques*, 221 S.W.3d 514, 526-27 (Tenn. 2007). The decision to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the coram nobis court. *Hall*, 461 S.W.3d at 496.

A petition for a writ of error coram nobis must be filed within one year after the judgment becomes final. T.C.A. § 27-7-103. For the purposes of coram nobis relief, a judgment becomes final thirty days after the entry of the judgment in the trial court if no post-trial motion is filed, or upon entry of an order disposing of a timely filed post-trial motion. *Mixon*, 983 S.W.2d at 670. It has been the "longstanding rule that persons seeking relief under the writ must exercise due diligence in presenting the claim." *Id.* Timely filing is an essential element of a coram nobis petition, and the State is not required to raise the statute of limitations as an affirmative defense. *Nunley v. State*, 552 S.W.3d 800, 828 (Tenn. 2018). However, "[t]o accommodate due process concerns, the one-year statute of limitations may be tolled if a petition for a writ of error coram nobis seeks relief based upon new evidence of actual innocence discovered after expiration of the limitations period." *Id.* at 828-29. "'[B]efore a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner.'" *Workman v. State*, 41 S.W.3d 100, 102 (Tenn. 2001) (quoting *Burford v. State*, 845 S.W.2d 204, 208 (Tenn. 1992)). Whether a petitioner is entitled to due process tolling of the statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness. *Nunley*, 552 S.W.3d at 830 (citation omitted).

Although the Petitioner acknowledges that he filed his coram nobis petition outside the one-year statute of limitations, he asserts that he is entitled to tolling of the

---

[6]     In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.

statute of limitations because the State failed to provide "possibly exculpatory evidence" to which he did not have access until the statute of limitations had expired. He claims that he did not have access to the incident reports through the Freedom of Information Act while his case involving the attempted murder of Mr. Boyd was pending.

In order to obtain coram nobis relief based on newly discovered evidence, a petitioner is required to exercise diligence in bringing his claim. *See Hall*, 461 S.W.3d at 495. The Petitioner has failed to establish that he was diligent in filing his petition for writ of error coram nobis and failed to provide any explanation why the petition was filed over a year after he received the incident reports. During the coram nobis hearing, the Petitioner testified that he received the incident reports in March or April 2014. The Petitioner did not file a coram nobis petition until September 11, 2015, well over a year from the time he received the "newly discovered evidence." We conclude that the Petitioner was not diligent in filing his petitioner for post-conviction relief and is not entitled to coram nobis relief. *See Joan Elizabeth Hall v. State*, No. M2017-01621-CCA-R3-ECN, 2018 WL 6566982, at *10 (Tenn. Crim. App. Dec. 12, 2018) (determining that the petitioner was not entitled to equitable tolling when she did not satisfactorily explain why she waited years after receiving the new evidence before filing her petition for writ of error coram nobis); *Melissa Barnett v. State*, No. E2012-00855-CCA-R3-PC, 2013 WL 709588, at *5) (Tenn. Crim. App. Feb. 26, 2013) (concluding that the statute of limitations should not be told when there is "[n]othing in the record explains why the Petitioner waited over three years to attempt to present her coram nobis claim.").

Further, the incident reports relate only to the attempted murder of the Mr. Boyd, and we cannot conclude that the information in the reports, if presented, may have led to a different result at trial. *See Vasques*, 221 S.W.3d at 525. It is undisputed that the Petitioner did not physically participate in the attack of Mr. Boyd, and there was no testimony at trial that suggested that he did. Rather, as the original prosecutor explained during the coram nobis hearing, the theory was that the Petitioner assisted in planning the attack of Mr. Boyd. The reports are not inconsistent with that theory. The Petitioner has failed to show that this newly discovered evidence may have led to a different result at trial. Accordingly, due process does not dictate the tolling of the statute of limitations.

To the extent that the Petitioner claims that the State failed to disclose the reports in violation of *Brady*, the Tennessee Supreme Court has held that "a coram nobis proceeding is not the appropriate venue to determine whether [a petitioner's] constitutional rights under *Brady* were violated." *Nunley*, 552 S.W.3d at 821. The Petitioner is not entitled to coram nobis relief.

(Doc. No. 30-35 at 5–7).

The state courts thus rejected the petitioner's coram nobis claim as untimely as a matter of state law. To the extent the claim in this case is the same claim raised in state court, the application of the statutory coram nobis limitations period is an adequate and independent state ground for

rejection of a claim, which renders this claim procedurally defaulted and not subject to federal habeas review. *Harbison v. Bell*, No. 1:97-CV-52, 2007 WL 128954, at *4 (E.D. Tenn. Jan. 16, 2007), *aff'd*, 503 F.3d 566 (6th Cir. 2007), *rev'd on other grounds*, 556 U.S. 180 (2009).

Alternatively, even if the court considered this claim to be an original *Brady* claim raised only in this action, the claim would fail on its merits.[7] To prevail on a *Brady* claim, a petitioner must prove three elements: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011) (quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999)). To establish prejudice, a petitioner must prove "that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* (quoting *Strickler*, 527 U.S. at 281).

Among the allegedly exculpatory documents on which the petitioner relies, the only one that provides any information contrary to what was offered at trial is a report in which the stabbing victim, Boyd, told an officer involved in transporting him by ambulance to the hospital that he had been attacked "because he knows information about inmate Lobbin's case and that a Metro Police

---

[7] Such a claim would be technically defaulted, but because "the requirements for showing cause and prejudice parallel the elements of the underlying *Brady* violation," *Hutchison v. Bell*, 303 F.3d 720, 741 (6th Cir. 2002), a petitioner who establishes a *Brady* violation necessarily overcomes any procedural default bar. *Bies v. Sheldon*, 775 F.3d 386, 396 (6th Cir. 2014) (explaining that cause and prejudice parallel two components of a *Brady* claim "with the suppression of the evidence constituting cause and the materiality of the evidence resulting in prejudice"). It is more straightforward, therefore, to turn directly to the merits of the *Brady* claim. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see also Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (proceeding directly to merits analysis because "the question of procedural default presents a complicated question . . . and is unnecessary to our disposition of the case"); *Ferensic v. Birkett*, 451 F. Supp. 2d 874, 887 (E.D. Mich. 2006) (performing de novo review of unexhausted habeas claim because "it is easier to address the merits of Petitioner's claim than to perform a procedural default analysis").

Detective was asking him questions." (Doc. No. 30-29 at 56). The petitioner does not explain what use he might have made of that report at trial had he been aware of it. The inmate witnesses who testified about the jailhouse conspiracy and stabbing testified to their own knowledge about the motivation behind the stabbing, not to the victim's understanding of why he was stabbed. One witness testified to the effect that he had been cautioned that Boyd had cooperated "on a few cases," (Doc. No. 30-6 at 22), which would readily explain Boyd's belief that another case might be involved in the attack on his life. And on cross-examination of the second witness, counsel elicited testimony to the effect that Boyd was providing information to the government about someone else, not the petitioner. (*Id.* at 48–50). Even if counsel had devised some use for the report at trial, it would only have been cumulative to that evidence. And assuming that counsel would not have been permitted to impeach the inmate witnesses with the record of Boyd's out-of-court statement,[8] the only value in the report would have been to lead counsel to interview and potentially subpoena Boyd or Lobbins to testify about the motivation for attack. But the court cannot base any finding of prejudice on pure conjecture about whether either of those individuals would have testified or what their testimony would have been.

Accordingly, this claim is either procedurally defaulted or fails on its merits.

## V.    CONCLUSION

For the foregoing reasons, the petitioner is not entitled to relief on any of his claims. The court will deny the requested relief and dismiss the petition.

---

[8]    Tennessee Rule of Evidence 613 permits, under certain circumstances, the use of "[e]xtrinsic evidence of a prior inconsistent statement **by a witness** [who is] afforded an opportunity to explain or deny the same." Tenn. R. Evid. 613(b). It does not authorize the use of such extrinsic evidence of a non-witness's hearsay statement. *See* Tenn. R. Evid. 801(c) (defining "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").

An appropriate order shall enter.

_____
ALETA A. TRAUGER
United States District Judge